# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: May 6, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| MATTHEW JIMENEZ, | \* | PUBLISHED |
| | \* | |
| Petitioner, | \* | No. 17-1190V |
| | \* | |
| v. | \* | Special Master Nora Beth Dorsey |
| | \* | |
| SECRETARY OF HEALTH | \* | Ruling Awarding Damages; Hepatitis A |
| AND HUMAN SERVICES, | \* | ("Hep A") Vaccine; Human Papillomavirus |
| | \* | ("HPV") Vaccine; Systemic Juvenile |
| Respondent. | \* | Idiopathic Arthritis ("sJIA"); Pain and |
| | \* | Suffering; Life Care Plan; Lost Wages. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Parisa Tabassian, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON DAMAGES[1]

On September 5, 2017, Matthew Jimenez ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018)[2] alleging that he suffered from juvenile rheumatoid arthritis as the result of Hepatitis A ("Hep A") and human papillomavirus ("HPV") vaccinations administered on September 18, 2014.  Amended ("Am") Petition at 1 (ECF No. 16).  On June 23, 2021, the undersigned issued a Ruling on Entitlement, finding Petitioner entitled to

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Ruling will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

compensation for his systemic juvenile idiopathic arthritis ("sJIA").  Ruling on Entitlement dated June 23, 2021 (ECF No. 86).

The parties were unable to resolve damages and requested a damages hearing and briefing.  Since then, the parties' briefs have been filed as well as expert reports and other evidence in support of damages, and a damages hearing has been held.  This matter is now ripe for adjudication.

After consideration of all the evidence,[3] and for the reasons described below, the undersigned finds that Petitioner is entitled to (1) $250,000.00 for actual pain and suffering, (2) $1,907.52 for out-of-pocket expenses, (3) lost earnings in accordance with the undersigned's findings, and (4) costs for certain disputed items in the life care plan.

## I.　　PROCEDURAL HISTORY

Petitioner filed his petition on September 5, 2017.  Petition (ECF No. 1).  The early procedural history from September 2017 through June 2021 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here.  See Ruling on Entitlement at 2-3.

Following the undersigned's Ruling on Entitlement, the parties engaged in settlement discussions but were not able to resolve this matter informally.  In order to resolve the outstanding damages issues, the parties provided briefs, a consolidated life care plan, expert reports, and medical literature and attended a damages hearing.

For pain and suffering, the parties were unable to come to an agreement and briefed the issue in 2023.  See Petitioner's Brief on Pain and Suffering Damages ("Pet. Pain and Suffering Br."), filed Sept. 22, 2023 (ECF No. 160); Respondent's Br. Regarding Pain and Suffering Damages ("Resp. Pain and Suffering Br."), filed Nov. 30, 2023 (ECF No. 167).  At the damages hearing in October 2025, the undersigned provided her preliminary finding that Petitioner is entitled to $250,000.00 in pain and suffering.  Damages Hearing Transcript ("Damages Tr.") 100.  In a status report after the damages hearing, Respondent indicated that the parties agree Petitioner is entitled to an award for pain and suffering but maintained that the parties did not agree to the amount.  Resp. Status Report in Response to Order (ECF No. 260) ("Resp. Post-Hearing Status Rept."), filed Dec. 22, 2025, at 2-3 (ECF No. 264).

The parties also disputed the appropriate out-of-pocket expenses to be awarded to Petitioner.  See Damages Tr. 101-02.  Following the October 2025 damages hearing, the undersigned examined Petitioner's documentation in support of his request for out-of-pocket

---

[3] While the undersigned has reviewed all the information filed in this case, only those filings and records that are most relevant will be discussed.  See Moriarty v. Sec'y of Health & Hum. Servs., 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision."); see also Paterek v. Sec'y of Health & Hum. Servs., 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

expenses and determined Petitioner is entitled to an award of $1,907.52 for out-of-pocket expenses. Order dated Nov. 21, 2025, at 1-3 (ECF No. 261). The parties were given two weeks to file any objections. Id. at 3. No objections were filed.

The third item in dispute is whether Petitioner is entitled to a loss of earnings under § 15(a)(3)(B) and if so, the amount of such lost earnings. See Resp. Post-Hearing Status Rept. at 2. The parties filed simultaneous briefs addressing this issue after the October 2025 damages hearing. Resp. Damages Br., filed Feb. 27, 2026, at 9-21 (ECF No. 268); Pet. Memorandum on Loss of Earnings ("Pet. Damages Br."), filed Feb. 27, 2026, at 1-13 (ECF No. 269).

Lastly, there are items of the life care plan in dispute, including, but not limited to, whether costs related to an emotional support dog are compensable under § 15(a)(1)(A), which the parties also briefed following the damages hearing in October 2025. See Resp. Post-Hearing Status Rept., Appendix ("App.") A; Resp. Damages Br. at 4-9, 19; Pet. Damages Br. at 14-15.

This matter is now ripe for adjudication.

## II.     FACTUAL HISTORY[4]

### A.      Brief Medical Record History

On September 18, 2014, Petitioner received his first HPV and first Hep A vaccinations from his primary care provider ("PCP"), Dr. Adam Cutler. Pet. Ex. 1 at 2, 42. At the time, he was a fifteen-year-old high school student with an unremarkable medical history. Id. at 41-42, 78; Pet. Ex. 8 at 1. Dr. Cutler did not document any rash, lesions, nighttime sweating, or other abnormal conditions, on the date of vaccination. Pet. Ex. 1 at 42-44.

Approximately one week after vaccination, Petitioner noticed a rash on his arms and legs. Entitlement Hearing Tr. ("Entitlement Tr.") 9. Petitioner characterized his rash as light pink salmon color, randomly splattered across his skin—like paint splatter. Id.; see also Pet. Exs. 49-51 (photographs). The rash was flat in appearance when Petitioner first noticed it. Entitlement Tr. 19. He did not think the rash was serious, so he ignored it until his mother saw it on his arms a few weeks later. Entitlement Tr. 10. The rash became progressively worse and itchy, and Petitioner developed other symptoms, including fevers, night sweats, joint pain, and body aches. Entitlement Tr. 12-13, 19.

On November 20, 2014, Petitioner presented to Dr. Cutler for evaluation of a rash on his arms, legs, and buttocks. Pet. Ex. 1 at 46-48. The rash was described as "intermittent, resolves spontaneously, over several weeks" and slightly itchy. Id. at 46. Dr. Cutler noted that Petitioner took no prescribed or over-the-counter medications. Id. Petitioner was diagnosed with urticaria hives, and Dr. Cutler recommended daily Zyrtec, and advised Petitioner to keep a diary to identify potential causes of his rash. Id. at 48.

---

[4] This factual history was largely taken from the undersigned's Ruling on Entitlement with additions from the updated medical records filed since the Ruling on Entitlement. See Ruling on Entitlement at 6-13.

On December 1, 2014, Petitioner presented to MedExpress, an urgent care facility, complaining of a rash, sore throat, and fever. Pet. Ex. 4 at 1. The rash was noted to be present for one month. Id. Rapid influenza ("flu") and strep tests were negative. Id. at 3. Petitioner was diagnosed with acute pharyngitis and contact dermatitis. Id. He was given prescriptions for oral amoxicillin and a topical steroid. Id.

Petitioner presented to Dr. Karimu Smith-Barron the next day, on December 2, 2014. Pet. Ex. 1 at 49. He had a fever of 101.8°F, down from 104°F the previous evening. Id. at 49-50. Dr. Smith-Barron noted Petitioner had a "fleeting" rash for two weeks and his mother stated the rash was still present after two months. Id. at 50; Entitlement Tr. 41. He was suspected to have a bacterial infection and was assessed with acute pharyngitis, presumed streptococcus, and hyperpyrexia. Pet. Ex. 1 at 52. Lab work revealed an elevated white blood count and increased granulocytes, and he had a negative rapid strep test. Id. at 12, 51, 89.

Petitioner was next seen on December 4, 2014 by Dr. Gary Lieberman, with continued fever, joint pains, sore throat, headache, and rash. Pet. Ex. 1 at 55-57. Dr. Lieberman documented, "[t]his rash seems unlike prior rash." Id. at 55. Physical examination was notable for a red rash around Petitioner's eyes and a macular rash on his extremities. Id. at 56. Petitioner also had limited range of motion ("ROM") of one knee and mild pain in his fingers and neck. Id. Throat cultures and mono spot test for Epstein-Barr virus were negative. Id. at 13, 56. He had an elevated white blood count, granulocytes, and lymphocytes. Id. at 56. Dr. Lieberman's diagnoses were hyperpyrexia and unspecified multiple arthropathy. Id. at 57.

On December 6, 2014, Petitioner returned to his PCP due to six days of persistent fevers, sore throat, and migratory joint pains. Pet. Ex. 1 at 59. He was diagnosed with hyperpyrexia and unspecified polyarthritis. Id. at 61.

Later that day, Petitioner was admitted to West Boca Medical Center, where he received an extensive work up. Pet. Ex. 1 at 98, 111, 147-57. He tested negative for ASO titer, Bartonella studies, CMV, rheumatoid factor, rotavirus, ANA screen, and Epstein-Barr virus. Pet. Ex. 1 at 101; Pet. Ex. 3 at 168, 176. Stool, blood, and urine microbiology tests were negative, and no evidence of bacteria was found. Pet. Ex. 1 at 154-55; Pet. Ex. 3 at 168.

He was transferred to Miami Children's Hospital ("Miami Children's") on December 10, 2014 for rheumatological evaluation with a presumed diagnosis of sJIA. Pet. Ex. 1 at 118; Pet. Ex. 3 at 168. Upon admission to Miami Children's, it was noted that Petitioner had nine days of fever of 104°F, sore throat, headache, migratory symmetric arthralgias, and macular blanchable nonpruritic, nonpainful rash on his upper and lower extremities. Pet. Ex. 2 at 102. He also had an elevated C-reactive protein of 18.3 (normal range is 0.0-1.0) and a high erythrocyte sedimentation rate of 55 (normal range is 0-30). Pet. Ex. 3 at 156, 160, 168.

Upon admission to Miami Children's, Petitioner was seen by rheumatologist Dr. Rafael Rivas-Chacon who noted a three-week history of an intermittent, erythematous, non-itchy rash, arthritis in two fingers, and arthralgias in the right wrist. Pet. Ex. 1 at 138. Petitioner was also seen by infectious disease expert Dr. Carolina Sanchez-Vegas, who noted that Petitioner's

symptoms reportedly began on November 30, 2014.  Pet. Ex. 2 at 102-08.  Petitioner was discharged on December 11, 2014, with diagnoses of prolonged fever, possible JIA, and rash. Id. at 122.  The discharge summary indicated the providers were "concerned about possible JIA given the history of migratory arthritis with the rash."  Id.  Petitioner was prescribed naproxen and instructed to follow up with rheumatology.  Id. at 123.

Petitioner was seen by his PCP in a follow-up on December 15, 2014, at which time he was still having twice daily fevers, along with daily arthritis, arthralgias, and rash.  Pet. Ex. 1 at 63.  He was assessed with viral disease, rash, hyperpyrexia, and polyarthritis.  Id. at 65.

On January 7, 2015, Petitioner had a follow-up examination with Dr. Sanchez-Vegas, his infectious disease specialist.  Pet. Ex. 1 at 125-30.  Dr. Sanchez-Vegas reported that after Petitioner was discharged, he continued to have fevers up to 104°F with accompanying headache, migratory symmetric arthralgias, and macular rash.  Id.  All symptoms were stated to recur during a fever and resolve daily when Petitioner was afebrile.  Id. at 125.  Dr. Sanchez-Vargas noted symptoms began on November 30, 2014.  Id.  She noted that Petitioner had a positive Immunoglobulin ("Ig") G for parvovirus, though he was negative for IgM.  Id. Petitioner was diagnosed with rash, joint pain, prolonged fever, and human parvovirus infection, though Dr. Sanchez-Vargas thought that parvovirus was unlikely.  Id. at 127-28.

Petitioner was seen by Dr. Angela Weatherall, a dermatologist, on January 28, 2015, due to an itchy, red rash on his back, arms, and legs, which he reported had been present for three months.  Pet. Ex. 1 at 184-85.  He was assessed with urticaria, and a punch biopsy was performed.  Id. at 188.  Dr. Weatherall recommended that Petitioner take Zyrtec.  Pet. Ex. 3 at 2.

Two weeks later, on February 12, 2015, Petitioner returned to see Dr. Weatherall who informed him that his biopsy was consistent with chronic urticaria.  Pet. Ex. 1 at 178-79, 188.  At a follow-up visit on March 12, 2015, Dr. Weatherall noted that Petitioner's urticaria had improved.  Pet. Ex. 3 at 11.

On June 2, 2015, Petitioner was seen at his PCP's office, reporting that he had been fever-free for a while, but his fever and joint aches had returned over the past week, along with some headaches, and his rash had not gone away.  Pet. Ex. 1 at 66-68.  The records indicate that Petitioner had not yet been tested for sJIA.  Id.  Lab results from blood drawn at this visit revealed elevated ferritin, erythrocyte sedimentation rate, C-reactive protein, and white blood cell count.  Id. at 24-25, 29; Pet. Ex. 3 at 191-200.

Petitioner presented to rheumatologist, Dr. Kristina Weirs-Shamir, on June 9, 2015.  Pet. Ex. 1 at 70, 166.  He reported that he had a rash that worsened with fevers, along with migratory joint pain in both knees and ankles, which caused difficulty walking.  Id.  He tested negative for Celiac disease and Lyme disease.  Id. at 24.

On June 16, 2015, Petitioner's mother called his PCP, reporting that Petitioner was getting worse, and she wanted a referral to see an infectious disease expert.  Pet. Ex. 1 at 31. Petitioner was seen at Miami Children's the following day by Dr. Vargas-Sanchez.  Id. at 191.

Chest X-rays were normal. Id. at 192. However, an ultrasound showed hepatosplenomegaly (enlargement of the liver and spleen). Id. at 194; Pet. Ex. 2 at 14-15.

On June 19, 2015, Petitioner's mother called the PCP again, stating that Petitioner's fever had returned and the lymph nodes under his arm were swollen. Pet. Ex. 1 at 73. He was seen by Dr. Jerome Sigua, an allergist/immunologist, on June 22, 2015. Id. at 199. Dr. Sigua ordered extensive bloodwork and recommended that Petitioner see a pediatric hematology oncologist for a bone marrow biopsy. Id. at 199-201.

Petitioner was seen by hematology oncologist, Dr. Melissa Singer, on June 29, 2015. Pet. Ex. 1 at 204-07. Dr. Singer noted that Petitioner had no diagnosis, but had multiple labs pending from various providers. Id. at 204. Bone marrow biopsy was performed on July 1, 2015. Pet. Ex. 6 at 32. It showed no overt immunophenotypic evidence of non-Hodgkin B-cell lymphoproliferative disorder, aberrant T-cells, or acute leukemia. Id.

On December 1, 2015, Petitioner presented to pediatric neurologist Dr. Farjam Farzam. Pet. Ex. 1 at 209. Dr. Farzam noted fevers worse at night than in the mornings, night sweats, headaches, and fatigue, but there was no rash present. Id. Petitioner was neurologically normal. Id. at 209-10. He assessed Petitioner with headaches and dizziness. Id. at 210. Petitioner had a follow-up with Dr. Farzam on January 12, 2016. Id. at 213. Dr. Farzam noted Petitioner's electroencephalogram ("EEG") study was normal. Id.

Petitioner returned to Dr. Weatherall on June 29, 2016. Pet. Ex. 3 at 15. He reported his urticaria had continually reoccurred over the year in cycles with fever, migratory joint pain, and occasional nausea and dizziness. Id. Dr. Weatherall observed that Petitioner had been seen by multiple specialists and all workups were negative, except for elevated erythrocyte sedimentation rate and C-reactive protein. Id. Dr. Weatherall performed another punch biopsy and administered a Kenalog injection. Id. at 15-16. The punch biopsy showed "mild superficial/mid-dermal polymorphous inflammatory infiltrate with predominance of neutrophils, edema, and no epidermal changes." Id. at 188. The comment section of the biopsy stated, "findings may be consistent with urticaria . . . . Similar changes can be seen in skin lesions of Still disease (sJIA). Clinical correlation is recommended." Id.

On July 11, 2016, Petitioner presented to rheumatologist, Dr. Korey Ullrich, on referral from Dr. Weatherall. Pet. Ex. 1 at 219. Dr. Ullrich noted Petitioner developed a rash on his arms and legs mid/late 2014. Pet. Ex. 5 at 1. In his "first cycle of symptoms," Petitioner had night sweats, fevers, rash, joint paint, and fatigue. Id. These symptoms lasted for approximately six months and then resolved. Id. Petitioner's "second cycle" occurred in May 2015, and since then he had similar flare ups of symptoms every three months. Id. Dr. Ullrich noted extensive testing confirmed etiologies for infection and malignancy were negative. Id. at 2-3. After reviewing Petitioner's biopsies and extensive work ups, Dr. Ullrich concluded that Petitioner's symptoms were consistent with sJIA. Id. at 1-2; Pet. Ex. 1 at 219. Dr. Ullrich diagnosed Petitioner with sJIA and prescribed prednisone. Pet. Ex. 1 at 221; Pet. Ex. 5 at 3.

On July 13, 2016, Petitioner presented to rheumatologist, Dr. Steven Goodman. Pet. Ex. 1 at 216. Petitioner had moderate to severe pain in both wrists, arms, and knees. Id. Dr.

6

Goodman opined Petitioner had a classical presentation of sJIA characterized by chronic arthritis with active synovitis, associated with rash and fever. Id. Dr. Goodman ordered additional laboratory tests and prescribed a Medrol dose pack. Id.

Petitioner returned to see Dr. Ullrich on August 4, 2016. Pet. Ex. 5 at 4. Dr. Ullrich noted Petitioner was improving, but experiencing side effects on prednisone. Id. at 6. "Extensive [work ups] for infection, malignancy, and other potential etiologies [were] negative." Id. On September 12, 2016, Dr. Ullrich recommended a sparing steroid agent, Actemra. Id. at 9. Petitioner stated he wanted to try homeopathic treatment before trying Actemra. Id. On September 23, 2016, Petitioner returned to Dr. Ullrich reporting his rash had worsened and he had decided to proceed with Actemra. Id. at 10. On November 9, 2016, Dr. Ullrich noted Petitioner's rash was present, but stable. Id. at 16, 18.

Moving forward to 2017, on March 27, Petitioner presented to Dr. Weatherall for hives. Pet. Ex. 3 at 19. Dr. Weatherall noted Petitioner had been diagnosed with sJIA, was taking Actemra, and doing well. Id. Dr. Weatherall noted Petitioner's only persistent symptom was flare ups of the rash. Id. Petitioner returned to Dr. Weatherall on April 6, 2017, and his disease was in remission, except for the persistent urticarial rash. Id. at 24.

Petitioner followed up with Dr. Ullrich on April 11, 2017 for a hives flare up. Pet. Ex. 5 at 25. Dr. Ullrich stated the cause of the flare was unclear, but it may have been trigged by medication or an infection. Id. at 27. Petitioner improved on high-dose prednisone. Id. at 28, 30. Dr. Ullrich noted Petitioner's urticaria was likely related to his sJIA. Id. at 33.

On July 14, 2017, Dr. Ullrich noted Petitioner's rash had resolved. Pet. Ex. 5 at 37. Petitioner's medications listed prednisone, Actemra, and Dapsone. Id. Then on August 11, 2017, Petitioner's rash reoccurred. Id. at 40. The assessment was sJIA, improved overall, with mild reoccurrence of rash. Id. at 42.

Petitioner continued with Actemra until September 4, 2018, when he switched to Anakinra, an IL-1 inhibitor. Pet. Ex. 38 at 17, 19. When Petitioner saw Dr. Ullrich on November 16, 2018, his rash had resolved, and he had no joint pain or fever. Id. at 23.

On September 27, 2019, Petitioner was involved in an accident that resulted in third-degree burns over 53% of his body. Pet. Ex. 37 at 7, 15. Petitioner spent over seventy days at the Jackson Memorial burn unit and underwent at least six graft surgeries. Id.; Entitlement Tr. 15.

Petitioner continued to see his rheumatologist on a regular basis, every 1-3 months, in 2020 and 2021. See Pet. Ex. 38 at 30-44; Pet. Ex. 54; Pet. Ex. 59. During the entitlement hearing in September 2020, Petitioner confirmed he was taking Ilaris, an IL-1 inhibitor, for his sJIA, and his sJIA was stable and asymptomatic. Entitlement Tr. 14, 84.

At a visit to Dr. Ullrich on April 15, 2021, Petitioner indicated that he had not been taking Ilaris since December 2020 due to an insurance issue. Pet. Ex. 54 at 3. Petitioner

7

reported no rash, joint pain, joint swelling, or fever. Id. Petitioner wanted to remain off Ilaris if possible. Id. at 5.

At his next visit with Dr. Ullrich on September 10, 2021, Petitioner reported his sJIA symptoms returned approximately two weeks prior. Pet. Ex. 59 at 1. Dr. Ullrich's assessment noted Petitioner was having a flare-up of his sJIA and would restart Ilaris. Id. at 3. In November 2021, at a follow-up examination, Petitioner's symptoms continued and he was waiting on approval of Ilaris to restart the medication. Id. at 5, 7. In January 2022, Petitioner continued to have symptoms related to his sJIA. Id. at 9. His Ilaris was still not approved; he was taking prednisone 5 mg daily for some relief. Id. at 10. However, Petitioner reported he was unable to work due to the symptoms. Id. at 10-12. A plan was made to start methotrexate in two weeks if Ilaris was not approved. Id. at 12.

Petitioner saw Dr. Ullrich last on April 21, 2022. Pet. Ex. 89 at 3. Petitioner reported continued symptoms. Id. His prednisone was increased to 10 mg daily "due to lack of efficacy," and Petitioner reported "feel[ing] somewhat better on the higher dose." Id. He stopped methotrexate due to side effects. Id. Ilaris remained pending, and Petitioner was instructed to continue with prednisone 10 mg "for now." Id. at 5.

Following this April 2022 appointment, Petitioner's insurance required him to change his rheumatologist from Dr. Ullrich to Dr. Kenneth Bresky, who he established care with on December 12, 2022. Pet. Ex. 90 at 1; Pet. Ex. 91 at 1. Dr. Bresky ordered Ilaris, and if not covered by insurance, he ordered intravenous Remicade or Humira. Id. at 3. Petitioner was also instructed to continue prednisone 10 mg as needed. Id.

Petitioner returned to Dr. Bresky on February 10, 2023 for an Ilaris injection. Pet. Ex. 91 at 5. Petitioner followed up with Dr. Bresky in March and reported doing well on Ilaris, reporting no fever, rash, or arthritis. Id. at 8. Petitioner continued to receive Ilaris injections through August 2023. Id. at 12-16. In August, Petitioner was noted as stable on Ilaris. Id. at 16. However, he reported intermittent migratory joint pain. Id.

Petitioner returned to Dr. Bresky on January 10, 2024, reporting he had not received Ilaris since August 2023 "due to concern of immunosuppression." Pet. Ex. 91 at 20. Petitioner reported intermittent migratory joint pain. Id. At some point in 2024, Petitioner started receiving Ilaris injections again. See id. at 24. He reported "feel[ing] good with Ilairs" at a follow-up visit with Dr. Bresky in December 2024, though he reported continued hand and wrist stiffness and pain. Id. In January 2025, his Ilaris increased from 150 mg to 300 mg and he no longer had hand and wrist stiffness and pain. Id. at 27.

## B.    Petitioner's Affidavits and Testimony

Petitioner stated he did not have a rash prior to his sports physical in September 2014. Pet. Ex. 9 at ¶ 2; Entitlement Tr. 8. At his sports physical, his doctor administered HPV and Hep A and vaccinations. Pet. Ex. 9 at ¶ 2; Entitlement Tr. 9. Petitioner recalled a week after vaccination he noticed a salmon-colored rash, like paint splatter, over his chest, back, buttocks, legs, and arms. Pet. Ex. 9 at ¶ 3; Entitlement Tr. 9. Petitioner stated there was noticeable raising

8

of the skin, but it did not hurt, so he did not mention the rash to anyone. Pet. Ex. 9 at ¶¶ 3-4; Entitlement Tr. 9-10. He also stated the rash was persistent in the evening and would fade in the morning. Entitlement Tr. 9.

After about two weeks with the rash, Petitioner's mother noticed the rash and expressed concern. Tr. 11-12. At that point, Petitioner's rash became worse and began to itch. Entitlement Tr. 12. He then started having daily fevers and sore throats. Pet. Ex. 9 at ¶ 5; Entitlement Tr. 12-13. His sore throat would make it difficult to eat and his fever led to night sweats. Pet. Ex. 9 at ¶ 5; Entitlement Tr. 12. His joints also began to hurt, and he had muscle aches. Pet. Ex. 9 at ¶ 5; Entitlement Tr. 12-13. Petitioner's joints would swell and be warm to the touch. Entitlement Tr. 25. When he tried to move there was a pinching sensation. Id. He stated he was eventually diagnosed with sJIA disease. Pet. Ex. 9 at ¶ 6.

Petitioner testified at the entitlement hearing in September 2020 that he was taking Ilaris for his sJIA and was symptom free. Entitlement Tr. 14. Prednisone, a corticosteroid, Actemra, an anti-IL-6 biological, and Kineret, an anti-IL-1 biological, also helped Petitioner's symptoms for a while. Entitlement Tr. 14-15, 83, 172. Prednisone could not be taken for long periods of time and Actemra helped with fevers, joint pain, muscle aches, and sore throat, but not his rash. Entitlement Tr. 23. Petitioner switched from Kineret to Ilaris after his accident in September 2019. Id.

At the damages hearing in November 2025, Petitioner indicated he was on Ilaris injections of 300 mg once per month. Damages Tr. 6. He explained that when he initially started Ilaris 150 mg "it was quite beneficial and [] annihilated the swelling entirely." Damages Tr. 8. His providers increased the dosage to 300 mg because it was no longer working as well. Id. On the current dosage of 300 mg, Petitioner reported no noticeable joint swelling but he continues to have some pain and discomfort, though not "immobilizing" pain. Damages Tr. 9-10; see also Pet. Ex. 77 at ¶ 5 (reporting some rashes and stiffness while on Ilaris, though "[he] can function"). Petitioner has been informed by his treating physicians that he is on the maximum dosage of Ilaris, so he was "not sure what's going to happen if [] things continue to worsen." Damages Tr. 13.

He explained "[t]here is an amount of pain in basically everything [he] [does]" and that "[e]verything is just always kind of an issue." Damages Tr. 10, 15. "Just even trying to close [his] eyes and [] fall asleep . . . [on] a normal day with an amount of pain is rather difficult." Damages Tr. 12. Petitioner explained he not an energetic person; he "[does not] have any energy to do anything nor [] the physical willpower to try to do anything from expecting an amount of pain or just in general." Damages Tr. 13-14. He is unable to do anything physically demanding. Damages Tr. 14; Pet. Ex. 77 at ¶ 8. Even with walking, "there is just an amount of pain somewhere." Damages Tr. 15. He uses crutches to relieve pain when needed. Damages Tr. 34.

At the time of the damages hearing in November 2025, Petitioner was working three days per week (Monday, Wednesday, Friday) and was unable to increase the number of days due to his symptoms.[5] Damages Tr. 15-16. He "believe[d] [he] [did] need a break between every

---

[5] Petitioner provided his W2s beginning in 2015. See Pet. Exs. 72, 76.

workday." Damages Tr. 17. He explained that working only three days per week does not leave him in an exorbitant amount of pain or discomfort. Damages Tr. 43.

Because Petitioner does not work full-time (40 hours per week), he is not eligible for benefits with his current employer such as health care insurance. Damages Tr. 93.

He hopes to continue his education though he acknowledged it would be a challenge to work and go to school simultaneously. Damages Tr. 19-21; Pet. Ex. 88 at 1-2. He noted he will just "push through the pain" as he "need[s] to work and . . . do school so [he] can get better work." Damages Tr. 21.

### C.    Medical Expert Reports[6]

### 1.    Petitioner's Expert, Dr. M. Eric Gershwin[7]

Dr. Gershwin opined Petitioner has sJIA, a chronic condition he will have for the rest of his life. Pet. Ex. 94 at 4. Dr. Gershwin further opined that Petitioner requires life-long care for his vaccine-related injury of sJIA. Pet. Ex. 61 at 1; Pet. Ex. 94 at 3-4. Petitioner's rheumatologic evaluations document pain and swelling of his joints as well as a continued rash on his arms and legs, which Dr. Gershwin maintained are due to Petitioner's sJIA and not his burn injury. Pet. Ex. 61 at 1. "Given [Petitioner's] severe and recurrent symptoms[,] [Dr. Gershwin] [] rate[d] his prognosis for suffering future symptoms as poor, meaning that [he] expect[s] [Petitioner] to suffer symptoms and require treatment indefinitely." Id. at 2; see also Pet. Ex. 94 at 4 ("[G]iven [Petitioner's] history and his treatment needs, [Dr. Gershwin] do[es] not expect a cure. [Petitioner's] sJIA is chronic and [Dr. Gershwin] believe[s] that he will most likely live with this condition for the remainder of his life.").

Regarding treatment, Dr. Gershwin opined that Petitioner requires the continued use of Ilaris. Pet. Ex. 94 at 4. With this medication, Petitioner should be able to function, but there will be restrictions on lifting, and he will continue to have joint pain, "fatigue, disturbed sleep, and [an] altered lifestyle." Id. Additionally, Dr. Gershwin noted concerns with long-term use of Ilaris and its associated risk of infection, and the long-term effects of sJIA, including lack of exercise and sedentary lifestyle, as well as the emotional toll of this chronic illness. Id.

Dr. Gershwin also noted a major concern for Petitioner is psychological and emotional support. Pet. Ex. 61 at 1. Further, Dr. Gershwin opined that Petitioner's sJIA will continue to adversely affect his earning capacity; "sJIA will adversely [a]ffect his ability to lift, walk, use his hands (keyboard use and writing)[,] and other mobility issues" and "[b]ackground pain, made worse during flares, may also have an effect on his ability to function." Id. at 2-3; see also Pet.

---

[6] For the sake of brevity, the undersigned discusses only the most relevant and pertinent portions of the expert reports.

[7] Dr. Gershwin submitted expert reports relevant to the damages issues herein and testified at the damages hearing. Pet. Exs. 61, 94; Damages Tr. 3. For Dr. Gershwin's qualifications and background, see Ruling on Entitlement at 13-14.

Ex. 94 at 3 ("He will have difficulty holding a forty hour per week job that requires a degree of manual labor (lifting more than 10 pounds); fatigue will continue to impact his life.").

In support of his opinions, Dr. Gershwin cited a 2025 article from Rygg et al.[8]  Pet. Ex. 95.  Rygg et al. explained that long-term studies of children with sJIA have shown that "a majority . . . reach adulthood with ongoing disease activity, on medication, or with recurrent flares."  Id. at 1.  "The chronic nature of JIA is known to affect overall quality of life, with chronic pain, limited mobility, and uveitis contributing to both physical and psychological impacts.  Several studies show that adults with JIA generally report poorer physical health, more pain, and more fatigue than their peers."  Id. at 3.  Rygg et al. also noted "[i]ncreased mental health issues, such as anxiety and depression, have been described in adolescents and young adults with JIA, although results are inconsistent.  Mental health can potentially affect physical functioning and quality of life, as well as adherence to medication and risk of disease flares."  Id.

### 2.    Respondent's Expert, Dr. Carlos D. Rose[9]

Dr. Rose opined Petitioner's sJIA prognosis is "considerably more favorable than that presented by Dr. Gershwin."  Resp. Ex. M at 10-11 (emphasis omitted).  Dr. Rose agreed treatment with Ilaris "remains essential."  Id. at 11.

At the damages hearing, Dr. Rose agreed that sJIA is "incur[]able" and that Petitioner may have flares in the future, but that his condition can be largely controlled with medical management.  Damages Tr. 60.  He believed that if Petitioner is taking appropriate medication and can afford to pay for school, he should eventually be able to complete his undergraduate degree.  Damages Tr. 61.  Dr. Rose also opined that if Petitioner takes appropriate medication, like Ilaris, he should be able to work.  Id.  Dr. Rose cited a paper showing 60%-65% of patients whose sJIA is under control have "a normal or high normal quality of life."  Id. (citing Resp. Ex. M-2 at 8).[10]

According to Dr. Rose, Petitioner has had a good response to Ilaris.  Damages Tr. 64-65.  Dr. Rose noted that in 2020, while on Ilaris, Petitioner "reached inactive disease" state, and then in September 2021, he suffered a systemic flare with rash, joint inflammation, and finger and wrist swelling with synovitis.  Damages Tr. 66-67.  In 2022, Petitioner had a "bad year . . . with active disease," especially while he was off Ilaris due to insurance issues and immune deficiency concerns.  Damages Tr. 66.  Ilaris was restarted in 2024, and Petitioner did fine until he

---

[8] Marite Rygg et al., What Have We Learned from Long-Term Studies in Juvenile Idiopathic Arthritis?—Prediction, Classification, Transition., 23 Pediatr. Rheumatol. 1 (2025).

[9] Dr. Rose submitted an expert report relevant to the damages issues herein and testified at the damages hearing.  Resp. Ex. M; Damages Tr. 3.  For Dr. Rose's qualifications and background, see Ruling on Entitlement at 19-20.

[10] Nienke M. ter Haar et al., Treatment to Target Using Recombinant Interleukin-1 Receptor Antagonist as First-Line Monotherapy in New-Onset Systemic Juvenile Idiopathic Arthritis: Results from a Five-Year Follow-Up Study, 71 Arthritis & Rheumatol. 1163 (2019).

developed increased joint symptoms, indicating a "wearing off effect" and the Ilaris dose was "doubled to the maximum, which is 300 milligrams." Damages Tr. 67-68. Records from 2025 showed Petitioner was responding well to Ilaris and was not having any adverse effects. Damages Tr. 68-69.

Dr. Rose discussed potential problems with Ilaris or other IL-1 therapies, and although he did not explain these problems in detail, he noted there are "always concerns about the use of biologics" as well as a risk of tuberculosis. Damages Tr. 63-64.

In conclusion, Dr. Rose opined that Petitioner had "mild disease" because he has not experienced severe joint destruction. Damages Tr. 71. He referenced Rygg et al. for the statistic that "severe disability [is] reported in only 3 to 11 percent of adults with JIA, although nearly half still experienced some degree of physical limitation." Damages Tr. 84-85 (quoting Pet. Ex. 95 at 2). Dr. Rose disagreed that Petitioner has a severe disability but agreed that he has some degree of limitation. Damages Tr. 85. He also opined that Petitioner is not in remission because he is on medication. Damages Tr. 92.

On cross-examination, Dr. Rose explained that symptoms of sJIA such as pain can occur even when there is no indication of active disease. Damages Tr. 87-89. Dr. Rose also agreed that Petitioner's testimony about his work schedule (working three days per week, with a day off in between workdays) was a reasonable accommodation if it allowed him to work. Damages Tr. 90.

### D.    Vocational Assessment Reports

#### 1.    Petitioner's Expert, Robert P. Tremp, Jr., MA, CRC, CLCP[11]

Mr. Tremp performed a vocational evaluation[12] of Petitioner on April 3, 2024 and a reevaluation on June 4, 2025, and for these evaluations, he reviewed relevant records and offered opinions regarding Petitioner's employability. Pet. Exs. 78, 92. During the first evaluation in April 2024, Petitioner described his pain in his "bilateral wrists, elbows, ankles[,] [] knees[,] . . . [and] bilateral hips," which varies daily. Pet. Ex. 78 at 3. Petitioner also described having good days and bad days, depending on the degree of his pain. Id. On good days, he can perform all activities of daily living with little pain, but on bad days, he is unable to perform these activities. Id. Petitioner admitted to feeling "sad, anxious, and depressed." Id. Walking, climbing, lifting, driving, sleeping, personal care, laundry, and housework are difficult when he is in pain. Id. at 4-5. His stamina has been affected, requiring him to "rest more frequently." Id. at 4. At his second evaluation in June 2025, Petitioner's chief complaints and physical limitations were essentially the same he reported the prior year. See Pet. Ex. 92.

---

[11] Mr. Tremp prepared two reports. Pet. Exs. 78, 92. Mr. Tremp is a certified rehabilitation counselor and certified life care planner. Pet. Ex. 79 at 1. For more information on his qualifications and background, see Pet. Ex. 79.

[12] For the definitions used by Mr. Tremp, see Pet. Ex. 78 at 8-11.

Petitioner's highest level of education completed is high school; he graduated in 2017. Pet. Ex. 78 at 5; Pet. Ex. 92 at 6. He attended Florida Atlantic University for three semesters and studied computer science. Pet. Ex. 78 at 5; Pet. Ex. 92 at 6. At the time of the first evaluation, Petitioner was attending Palm Beach State college part-time, studying computer science. Pet. Ex. 78 at 5. He was hoping to obtain a bachelor's degree. Id. As of the second evaluation in June 2025, Petitioner had changed schools and was attending online classes at Capella University, where he was studying technical information assurance and cyber security, and he still hoped to obtain a bachelor's degree. Pet. Ex. 92 at 6. He was enrolled in one class and did not know how long it would take to get a degree. Id. Petitioner reported that "[h]e struggle[d] to keep up with his job and the coursework." Id.

Regarding prior employment after high school, Petitioner worked part time for a pancake house, a painting company, did some contract programming, was a driver/cook for a pizza place, and was a busser at a restaurant. Pet. Ex. 78 at 6-7; Pet. Ex. 92 at 7-8. In 2021, he wanted to be a waiter but was unable to due to his pain. Pet. Ex. 78 at 6; Pet. Ex. 92 at 7. In July 2023, he began part-time work for a plumbing service, with an hourly wage of $17.50. Pet. Ex. 78 at 5-6; Pet. Ex. 72 at 6-7. His duties include answering the phone, permitting, and paperwork. Pet. Ex. 78 at 6; Pet. Ex. 72 at 7. During the June 2025 evaluation, Petitioner reported he continued to work at the plumbing company in the same capacity: same hours, hourly wage, and duties. Pet. Ex. 92 at 6.

Using the RAPEL[13] methodology, which is widely accepted by vocational rehabilitation professionals, and taking into account the opinions of Dr. Gershwin as to Petitioner's needs for life-long care of his disease, the effect of sJIA on earning capacity, and other relevant factors, Mr. Tremp opined that Petitioner "suffered a 40% to 50% reduction of work life expectancy or an average of 45.0% loss of earning capacity" due to physical issues objectively stated in the records and "subjectively reported" by Petitioner. Pet. Ex. 78 at 12-13. Mr. Tremp also opined that Petitioner is limited to sedentary employment and has sustained a reduced work-life expectancy, noting Petitioner "remain[s] symptomatic and remains treating which can impact persons even at the sedentary level . . . resulting in the 40%-50% reduction in overall production." Id. at 13. Mr. Tremp deferred to an economist for calculations "based on both an associate degree and bachelor's degree level of educational attainment." Id. Mr. Tremp's opinions are held to a reasonable degree of probability. Id.; Pet. Ex. 92 at 15. In his second report, Mr. Tremp stated that his conclusions (as of July 1, 2025) remained unchanged. Pet. Ex. 92 at 12-15.

---

[13] The RAPEL method consists of five factors: (1) rehabilitation plan, (2) access to the labor market, (3) placeability, (4) earning capacity, and (5) labor force participation. Pet. Ex. 78 at 8. For a detailed explanation of each factor, see Pet. Ex. 78 at 8.

### 2.    Respondent's Expert, Dr. Behnush Mortimer, Ph.D., CRC, CVE[14]

Dr. Mortimer completed her vocational evaluations on August 7, 2024 and July 10, 2025. Resp. Ex. I at 2; Resp. Ex. N at 1.  Her first report includes a summary of Petitioner's education and employment history which has been summarized above, and will not be repeated here.  See Resp. Ex. I at 3-4, 18-19.  Petitioner's wages from 2015 to 2021 were also summarized.[15]  Id. at 4-6.

In discussing her opinions, Dr. Mortimer explained that Petitioner's "employability and earnings capacity will be dependent on the skills, education[,] and employment [] probable for him . . . but for the vaccine related complaints, and to compare that to what trajectory he is expected to have now."[16]  Resp. Ex. I at 25.

Summarizing Petitioner's vaccine-related injury, Dr. Mortimer agreed that Petitioner's subjective impairments included "fatigue and polyarthritis with difficulty in ability to lift, walk, use of hands for keyboard and writing, and other mobility issues."  Resp. Ex. I at 25.  Dr. Mortimer agreed that Petitioner's future employment should be in the range of "sedentary to

---

[14] Dr. Mortimer prepared two reports.  Resp. Exs. I, N.  For almost 20 years, Dr. Mortimer has "provided vocational rehabilitation counseling, placement, and consulting services to individuals with disabilities in a variety of employment settings."  Resp. Ex. I at 28.  She has "[e]xperience[] in case management, educational and career counseling, vocational evaluation (including administering and interpreting of vocational tests), job analyses, labor market surveys, wage earning capacity, vocational plan development and monitoring, job development and job placement utilizing demographic and nationwide statistics, ergonomic recommendations, job accommodations, and program management."  Id.  For more information on her qualifications and background, see Resp. Ex. I at 28-30.

[15] Petitioner's W2s from 2015 to 2021 show earnings as follows: 2015 ($576.00), 2016 ($739.00; $4,362.00), 2017 ($3,434.00; $4,558.00; $104.00), 2018 ($5,452.72.00), 2019 ($10,476.00; 1099-B $4,729.00), 2020 ($64.00; $4,208.00; 1099-B $12,003.00), 2021 ($7,891.00; $7,262.00). Resp. Ex. I at 4-6.

[16] This statement appears to conflict with the Vaccine Act.  Because Petitioner was a minor at the time of his vaccine-related injury, § 15(a)(3)(B) of the Vaccine Act applies and provides compensation for lost earnings after the age of 18 when such person's "earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded and whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond." § 15(a)(3)(B).  The amount of such compensation "is determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary."  Id.  For child claimants, determinations for lost wages should be based on the general work-life expectancy of an uninjured individual, not the petitioner's work-life expectancy.  Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *25 (Fed. Cl. Spec. Mstr. Mar. 18, 1996) (citing Edgar v. Sec'y Health & Hum. Servs., 989 F.2d 473 (Fed. Cir. 1993)).

14

semi-sedentary." Id. However, Dr. Mortimer opined that Petitioner could likely work 40 hours per week based on the fact that Petitioner, at the time of this evaluation in August 2024, was working four days a week[17] and taking three courses at the community college, which when combined demonstrated an ability to work full time. Id.

Further, Dr. Mortimer opined that Petitioner "will be successful in obtaining future full-time employment at earnings commensurate for males with a [b]achelor's degree . . . in semi-sedentary occupations likely computer/administrative type occupational fields." Resp. Ex. I at 26. Dr. Mortimer estimated that Petitioner had three years of education remaining in Fall 2024 to obtain his bachelor's degree, with an anticipated completion date of June 2027. Id. Petitioner's earning capacity based on males with a bachelor's education estimated at the median weekly earnings was $1,906.00 or $99,112.00 per year. Id. Dr. Mortimer acknowledged that Petitioner's earnings would be adversely affected by his need for "treatment and medication management, reasonable accommodations, selective job placement, possible reduction and hours at times, and possible long term degenerative arthritis." Id. Dr. Mortimer opined that Petitioner therefore had a reduced earning capacity of 10% to 30%, with a median of 20%. Id.

In a supplemental report, Dr. Mortimer noted that Petitioner's February 7, 2025 affidavit stated that Petitioner was working four days a week, seven hours a day for financial reasons.[18] Resp. Ex. N at 2. Petitioner was enrolled in a full course load at Capella University, had completed 28 out of 40 classes toward his bachelor's degree, and held various software application certifications. Id. Dr. Mortimer also reviewed updated medical records showing that Petitioner was doing well on Ilaris, although his dose was increased January 2025 due to pain. Id. at 2-3. Based on this new information, Dr. Mortimer opined that "as long as [Petitioner] continues to be medically managed by Ilaris or other prescription, he would not have a reduced earning capacity." Id. at 3.

### E.    Economist Reports

#### 1.    Petitioner's Expert, Mark S. McNulty, Ph.D.[19]

Dr. McNulty summarized Petitioner's education, work history, and the vocational expert report, and acknowledged Mr. Tremp's opinion that Petitioner has sustained a 45% loss of earnings capacity due to his vaccine-related injury. Further, Dr. McNulty noted that a 45% loss was "consistent with [Petitioner's] actual work experience." Pet. Ex. 80 at 2. Dr. McNulty

---

[17] At the hearing, Petitioner reported that he had been unable to continue to work four days per week due to his vaccine-related injury, and that he was working three days per week, eight hours per day. Damages Tr. 15-17, 32.

[18] See supra note 17.

[19] Dr. McNulty provided two reports and a letter. Pet. Exs. 80, 84, 93. Dr. McNulty obtained his Ph.D. in economics and statistics from Iowa State University in 1985. Pet. Ex. 80 at 47. For further information on his qualifications, work experience, and publications, see Pet. Ex. 80 at 47-52.

opined that the 45% loss reflects Petitioner's reduction from the "typical 40-hour work week in hours" but "does not include any hourly wage impacts" due to Petitioner's injury.  Id.

Dr. McNulty calculated earning capacity without injury from age 18 to age 66, and separated such calculations into two periods relative to Petitioner: (1) a past period (age 18 to August 4, 2024, or age 25, Petitioner's age the year of the report, excluding the year when Petitioner had a burn injury unrelated to his vaccine injury that limited his ability to work) and (2) a future period (age 25 to age 66).  Pet. Ex. 80 at 4.  He used the Vaccine Act statutory earnings (hereafter "statutory earnings")[20] for these periods based on the "average earnings for workers in the private, non-farm section provided by the Bureau of Labor Statistics (BLS) to the U.S. Department of Justice."  Id.  For the past period, gross wages were $1,252.00 per week ($65,417.00 per year), and for the future period, gross wages were $1,457.00 per week ($76,128.00 per year).[21]  Id. at 4.  He then applied deductions for periods of unemployment, deductions for Social Security and Medicare taxes and personal taxes, as well as deductions for health insurance policy.  Id. at 5.

Regarding the future period, age 25 to 66, Dr. McNulty used age 66 as the retirement age instead of the average age of 65 based on the Labor Force Participate Rate ("LFPR") from the Bureau of Labor Statistics.  Pet. Ex. 80 at 7.  He opined "[a] natural definition of average age of retirement is the age at which the LFPR declines to 50%."  Id.  In support, Dr. McNulty cited a 2022 paper by Warshawsky,[22] which reported that "over the past two decades, the average retirement age has risen by nearly three years."  Id. at 42.  While "there was a dip in the average retirement age" caused by the COVID pandemic, "it has since recovered."  Id.  However, the data described by Warshawsky does not support an average age of retirement of 66; instead, Warshawsky noted the average retirement age has increased "to nearly 65 in the most recent reading."  Id. at 41-42.  Dr. McNulty also cited a Monthly Labor Review published by the BLS in September 2023 and authored by Dubina[23] that provided projections from the years 2022 to 2032.  Id. at 29-33.  While this publication projects an increase in labor participation for those 65 to 74, the increase does not reach a number that reflects the average age of retirement.  See id.

Next, Dr. McNulty applied Mr. Tremp's recommended reduction or loss of earnings of 45% (earnings with the vaccine-related injury are 55% of earnings with no injury).  Pet. Ex. 80 at 5.

---

[20] § 15(a)(3)(B).

[21] For how he obtained these amounts as well as the growth rates used, see Pet. Ex. 80 at 4-5.

[22] Mark J. Warshawsky, The Average US Retirement Age Increased over the Past 30 Years, Am. Enter. Inst., May 2022, at 1, https://www.aei.org/research-products/report/the-average-us-retirement-age-increased-over-the-past-30-years/.

[23] Kevin S. Dubina, Labor Force and Macroeconomic Projections Overview and Highlights, 2022-32, Monthly Lab. Rev., U.S. Bureau of Lab. Stats. (September 2023), https://www.bls.gov/opub/mlr/2023/article/labor-force-and-macroeconomic-projections.htm.

Dr. McNulty applied a reduction of 4.4% of gross wages for periods of unemployment (work-life expectancy) based on long-range forecasts and unemployment rate data from the Congressional Budget Office ("CBO").  Pet. Ex. 80 at 5, 23.  Dr. McNulty strongly disagreed with Dr. Kennedy's use of the Markov model and assessment that the statutory earnings be calculated based on a work-life expectancy of 38.08 years. Pet. Ex. 84 at 5.  Dr. McNulty agreed that the data used in the Markov model is based on the same data underlying unemployment and labor force participation rates, however, he opined that "there is no evidence that the resulting Markov outputs are reliable measures of work behavior" and thus, they "should not be relied upon to make real decisions without evidence of their reliability."  Id.

Dr. McNulty identifies "two unrealistic assumptions" used in the Markov model.  Pet. Ex. 84 at 5.  The first, he explained, is that the Markov model assumes that "labor force participation rates are constant over time."  Id.  Dr. McNulty provided an example disproving this assuming—namely that there has been an increasing trend of older workers in the work force.  Id.  In support, he cited the BLS data on labor from Dubina projecting the ten-year period of 2022 to 2032.  Id. (citing Pet. Ex. 80 at 29-32).  The second assumption is that the Markov model assumes that "only current labor force status is important for predicting future behavior, and an individual's work history is irrelevant."  Pet. Ex. 84 at 5.  He cited a paper by Shibata[24] to show the problems with the Markov model.  Id. (citing Pet. Ex. 99).  Shibata explained that the Markov model has the two problems identified by Dr. McNulty: it depends on current labor force status and it does not account for "duration-dependent transition probabilities."  Pet. Ex. 99 at 3.  The model proposed by Shibata—the Hidden Markov model ("HMM")—offers "an essential improvement" over the Markov model because "the data suggest that workers' past labor force history significantly predicts [] transition probability."  Id. at 4.  Shibata's research "cast[ed] doubt on the long tradition of analyzing labor market dynamics assuming that observed labor force status follows the [] Markov model."  Id. at 44.  For example, across all education groups, workers aged 25 to 39 and 40 to 54 "have the longest expected number of years in employment in the next twenty years if they were employed for the past three years."  Id. at 61.

Dr. McNulty also adjusted for payroll taxes and income taxes.  Pet. Ex. 80 at 5.

Next, Dr. McNulty included retirement benefits that Petitioner would have received if he had not suffered his vaccine injury.  Pet. Ex. 80 at 6.  He stated these included "employer contributions to a private retirement plan and Social Security benefits" that Petitioner "would have received" if he had not been injured.  Id.  He adjusted the retirement benefits by personal taxes for individuals 65 and older.  Id.  Dr. McNulty did not define or explain "private retirement plan," but cited a Table (without unclear source) for support.  Id. at 26 (labeled Attachment 7).

Dr. McNulty used a discount rate of 1.1% to reduce the number to net present value.  Pet. Ex. 80 at 6.

Using the above-stated parameters, Dr. McNulty opined that Petitioner's loss of earnings was $949,257.00 (as of 2024).  Pet. Ex. 80 at 8-9.

---

[24] Ippei Shibata, Labor Market Dynamics: A Hidden Markov Approach (Int'l Monetary Fund, Working Paper No. 19/282, 2019).

In a supplemental letter, dated July 11, 2015, Dr. McNulty explained that he had reviewed Mr. Tremp's second evaluation dated July 1, 2025, and that the updated vocational report did not change his opinions or analysis.  Pet. Ex. 93 at 1.  Dr. McNulty acknowledged that updated calculations will be required after this ruling is issued.  Id.

## 2.    Respondent's Expert, Patrick F. Kennedy, Ph.D.[25]

Dr. Kennedy calculated two sets of earnings, one using the statutory earnings for a vaccine injured minor (which he termed, "But-For Earnings") and the other based on guidance he received from counsel for the Respondent in the situation "where a vaccine injury occurred while Petitioner was a minor, but Petitioner is earning income an adult" (which he termed, "Vaccine-Injured Earnings").  Resp. Ex. J at 3-7.  He then compared the two, and because the second calculation (based on Petitioner's earning income as an adult with a Bachelor's degree or "Vaccine-Injured Earnings") was higher, he opined that Petitioner was not eligible for loss of earnings.  Id. at 7.

First, for the statutory earnings calculation, Dr. Kennedy used a retirement age of 65.05, which would be 47.05 years in the work force.  Resp. Ex. J at 4.  Dr. Kennedy then used the Markov model to adjust the number of years in the work force (47.05) to reflect Petitioner's statistical work-life expectancy, which is "the number of years [Petitioner] would be attached to the labor force, either looking for work or working," and reflects "voluntary and involuntary separations from the labor force that are typically experienced by U.S. workers."  Id.  He calculated Petitioner's statistical work-life expectancy as 38.08 years, using the weighted average in Skoog et al.  Id. at 4, 17 fig. 4 (citing Resp. Ex. J-3).[26]  He adjusted each year of Petitioner's earnings by taking the ratio of the number of years of statistical work-life expectancy (38.08) to the number of years to retirement (47.05), which is 0.81, and multiplying that by Petitioner's earning each year.[27]  Id. at 4.  He then reduced Petitioner's annual earnings for the cost of health insurance and taxes and applied a net present discount rate of 0.85% for future earnings.  Id. at 5.  He concluded past But-For Earnings are $268,420.00 and future But-For Earnings, discounted to present value, are $1,428,192, for a total compensation of statutory earnings of $1,696,612.  Id.  In his 2025 supplemental report, he updated this amount to reflect

---

[25] Dr. Kennedy submitted three reports.  Resp. Exs. J-K, O.  Dr. Kennedy is an economist who "provides analysis, consultation, and expert opinions in business and dispute contexts," including lost earnings.  Resp. Ex. J at 22.  For more information on his background and qualifications, see Resp. Ex. J at 1, 22-23.

[26] Gary R. Skoog et al., The Markov Model of Labor Force Activity 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors, 28 J. Forensic Econ. 15 (2019).

[27] To calculate statistical work-life expectancy and projected final separation from the workforce, he averaged data for males and females, consistent with Childers v. Secretary of Health & Human Services, No. 96-194V, 1999 WL 218893 (Fed. Cl. Spec. Mstr. Mar. 26, 1999).  Resp. Ex. J at 4 n.20.

2024 data, which led to past But-For Earnings of $296,155.00 and future But-For Earnings, discounted to present value, of $1,406,094, for a total of $1,702,249.  Resp. Ex. K at 2-4.

Next, for the Vaccine-Injured Earnings, Dr. Kennedy used Petitioner's actual earnings since 18 and the median annual earnings for males with a bachelor's degree from the U.S. Census Bureau based on Dr. Mortimer's opinion that Petitioner will have a bachelor's degree and job by a certain date in 2027, with adjustments every 10 years until 2066 (projected final separation) to comport with experiential wage growth data from the U.S. Census Bureau.  Resp. Ex. J at 5-6; Resp. Ex. K at 4-5.  He then adjusted the amount by statistical work-life expectancy (37.96),[28] the impact of Petitioner's vaccine injury on his work-life expectancy (20% in his first report, and 45% in his second report), and applied reductions for health insurance, and taxes. Resp. Ex. J at 5-7; Resp. Ex. K at 4-5.  He applied a net present discount rate of 0.85% for vaccine injury earnings.  Resp. Ex. J at 5-7; Resp. Ex. K at 4-5.  Dr. Kennedy applied a net present discount rate of 1.50% for future vocational costs and Social Security retirement benefits (see below).  Resp. Ex. J at 14.

Dr. Kennedy compared this number (the Vaccine-Injured Earnings) to the amount for statutory earnings, or But-For Earnings, noted above.  Resp. Ex. J at 7.  Because the amount he calculated for the Vaccine-Injured Earnings, using the 20% reduced work-life expectancy and based on Petitioner obtaining a bachelor's degree, exceeded the statutory But-For Earnings, Dr. Kennedy opined he is ineligible for compensation for lost earnings based on the Vaccine Act and Holihan.  Id.  Using the calculation, and just altering the reduced work-life expectancy from 20% to 45%, he calculated total lost earnings to be $187,720.00.  Resp. Ex. K at 4-5, 9-10.

Dr. Kennedy provided a short report on August 11, 2025 amending his opinion by updating his calculations to reflect no reduced earnings based on Dr. Mortimer's July 10, 2025 report (Resp. Ex. N) and the passage of time.  Resp. Ex. O at 2.  Dr. Kennedy's updated calculations determined Petitioner would be ineligible for compensation due to his assessment that Petitioner's wages will be greater than the statutory earnings, or But-For Earnings.  Id.

Regarding retirement benefits, Dr. Kennedy acknowledged the holding from Bryan v. Secretary of Health & Human Services, No. 14-898V, 2024 WL 3797739 (Fed. Cl. Spec. Mstr. July 15, 2024).  Thus, he calculated Petitioner's loss of Social Security benefits.  Resp. Ex. J at 7-8; Resp. Ex. K at 6-7; Resp. Ex. O at 5.

## III.    PAIN AND SUFFERING

### A.    Legal Framework

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  Brewer, 1996 WL 147722, at *22-23.

---

[28] See Resp. Ex. J-3.

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation.").  Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering.  I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case").  The undersigned may also rely on her experience adjudicating similar claims.  Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Graves, 109 Fed. Cl. at 589-90.  Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

## B.    Parties' Contentions

### 1.    Petitioner's Contentions

Petitioner requests a pain and suffering award of $250,000.00.  Pet. Pain and Suffering Br. at 11, 14.  If Petitioner is not granted the statutory cap of $250,000.00 for past pain and suffering, he requests future pain and suffering of $15,000.00 per year until he meets the cap.  Id.

Petitioner maintains that he has suffered "extreme physical pain and emotional distress" from his chronic, debilitating vaccine-induced sJIA since 2014, more than 11 years ago.  Pet. Pain and Suffering Br. at 12-14.  Petitioner was not diagnosed with sJIA for over one-and-one-half years after symptom onset, and suffered from "uncontrolled symptoms and [] mental anguish of not knowing what was wrong."  Id. at 14.  In those one-and-one-half years, Petitioner

experienced a rash (sometimes itchy), sore throat leading to difficulties eating and weight loss, night sweats, trouble sleeping, high fevers, headache, muscle aches, joint swelling, joint pain, fatigue, and difficulty walking.  Id. at 12-13.  He also was hospitalized for these symptoms, and received a bone marrow biopsy.  Id.  Even after diagnosis, his rash and joint pain continued.  Id. at 13.  Petitioner tried a variety of medications with varying efficacy, and when Ilaris began working, his insurance no longer covered the medication, leading to a relapse of symptoms.  Id. Petitioner also explained his pain left him unable to work, and he suffered from anxiety and depression.  Id.

Petitioner maintains he is entitled to an award of no less than $250,000.00 for his pain and suffering and emotional distress that he has suffered since 2014 and will continue to suffer. Pet. Pain and Suffering Br. at 14.

### 2.    Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $175,000.00 for pain and suffering.  Resp. Pain and Suffering Br. at 1.

Respondent agrees that Petitioner's condition "will likely persist for life."  Resp. Pain and Suffering Br. at 8.  However, Respondent maintains his symptoms are mild and can be quickly controlled with medication.  Id.  To summarize, Respondent noted that Petitioner experienced symptoms associated with his sJIA starting in November 2014, with a complete remission from December 2020 through September 2021, when he was not taking any sJIA medication.  Id. Additionally, over the years, Petitioner's symptoms "waxed and waned," with periods of time when his symptoms were controlled with oral steroids when Ilaris was inaccessible.  Id. Furthermore, Respondent notes "there is significant dissonance between [P]etitioner's reported symptoms in his brief and the contemporaneous medical records."  Id. at 11.  Thus, Respondent contends that "contrary to [Petitioner's] current claims, the contemporaneous medical records show that [P]etitioner's sJIA remains well controlled."  Id.

Respondent maintains Petitioner cannot establish his sJIA prevents him from gainful employment.  Resp. Pain and Suffering Br. at 8-9.  For support, Respondent noted Petitioner's records show that his condition can be fully controlled with Ilaris.  Id. at 9.  Respondent also added that applications for Social Security supplemental income and disability insurance were denied based on a finding that Petitioner is capable of gainful employment.  Id.; see Pet. Ex. 74.

Next, Respondent asserts the record does not support a finding that Petitioner's sJIA substantially disrupted his life as he was able to complete high school, excel academically, and obtain a scholarship for college during years where he was symptomatic.[29]  Resp. Pain and Suffering Br. at 9-10.

Respondent urges the Court to not ignore Petitioner's severe burn injury in September 2019 when calculating his pain and suffering award here.  Resp. Pain and Suffering Br. at 10. "This event undoubtedly impacted [P]etitioner both emotionally and physically, may have

---

[29] Petitioner needs approximately 32 credits to obtain his college degree.  Tr. 29.

derailed his education, and he will undoubtedly deal with the sequala for the rest of his life." Id. Additionally, in 2021, Petitioner was in a motor vehicle accident that resulted in injuries to his lower back and neck, which Respondent contends also "undoubtedly impact[ed] [P]etitioner." Id. Therefore, because neither intervening event is vaccine-related or related to his sJIA, "no compensation for damages associated with either of these events should be awarded." Id. at 10-11.

Lastly, Respondent notes no comparable cases were provided by Petitioner in support of his pain and suffering request. Resp. Pain and Suffering Br. at 12. Respondent then cites distinguishable and less severe cases of sJIA and argues Petitioner here should receive a lower pain and suffering award. Id. at 12-14.

In Ramsay, a proffered sJIA case following a ruling on entitlement, the petitioner was awarded $250,000.00 in pain and suffering. Ramsay v. Sec'y of Health & Hum. Servs., No. 11-549V, 2017 WL 1150796, at *1-2 (Fed. Cl. Spec. Mstr. Feb. 28, 2017) (Damages Decision). The petitioner in Ramsay was 15 years old at the time of vaccination. Ramsay v. Sec'y of Health & Hum. Servs., No. 11-549V, 2015 WL 9665584, at *1 (Fed. Cl. Spec. Mstr. Dec. 18, 2015) (Ruling on Entitlement). She required two hospitalizations in the month of onset and received long-term steroids and methotrexate for treatment. Id. Respondent acknowledges that because this was a proffer, "it is very difficult to compare this case." Resp. Pain and Suffering Br. at 12. Yet, Respondent's counsel speculates that because "a substantial amount for wage loss" was awarded, the Ramsay petitioner "most likely" received the full amount for wage loss for a minor, "suggest[ing] [] there was evidence [the petitioner's] sJIA would likely prevent her from any future gainful employment." Id. at 12-13 (citing Ramsay, 2015 WL 9665584, at *2). Thus, because Petitioner's course was less severe here, Respondent argues he should not receive an award of $250,000.00. Id. at 13.

In Cabrera, the minor child (L.C.) was awarded $200,000.00 in pain and suffering for his sJIA; however, this was also a proffered case following a ruling on entitlement and did not contain reasoning in support of the pain and suffering award. Resp. Pain and Suffering Br. at 13 (citing Cabrera ex rel. L.C. v. Sec'y of Health & Hum. Servs., No. 13-598V, 2017 WL 510466, at *1 (Fed. Cl. Spec. Mstr. Jan. 12, 2017) (Ruling on Entitlement); Cabrera ex rel. L.C. v. Sec'y of Health & Hum. Servs., No. 13-598V, 2020 WL 1670699, at *1 (Fed. Cl. Spec. Mstr. Mar. 11, 2020) (Damages Decision)). Respondent maintains L.C. had a "more severe" sJIA, at a younger age (nine months), which required "more significant care" than Petitioner here. Id. at 13-14. Therefore, Petitioner here should be awarded less than $200,000.00 in pain and suffering.

In conclusion, Respondent maintains Petitioner has failed to show a pain and suffering award of $250,000.00 is supported by the facts of his case and when comparing his case to other sJIA vaccine cases. Resp. Pain and Suffering Br. at 14. Instead, Respondent contends a pain and suffering award of $175,000.00 is reasonable, fair, and appropriate. Id. The evidence in this matter, according to Respondent, "establishes that [P]etitioner's clinical presentation was less severe than other cases involving sJIA." Id. Respondent agrees "[P]etitioner (1) understood his injury, (2) his injury was severe enough to warrant regular medical appointments with specialists and treatment with a variety of medications, and (3) he experienced the injury since approximately November 2014," but asserts Petitioner's "symptoms were consistently mild, he

22

experienced significant periods of time where he was asymptomatic, and his clinical presentation was not as severe as other sJIA cases." Id.

### C.    Analysis

In determining a pain and suffering award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. The undersigned has reviewed the entire record, including medical records, declarations, affidavits, testimony, expert reports, and all other evidence that has been filed, and finds an award of $250,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering. Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and he has full awareness of his suffering.

The factors that particularly influence this award are as follows. Regarding duration, the undersigned and the parties agree Petitioner has suffered from his injury since November 2014, and will continue to suffer from sJIA for the rest of his life. Respondent argues there have been periods of time since onset where Petitioner was asymptomatic, which should be considered. However, Petitioner has already suffered for over ten years, and will continue to suffer for the remainder of his life. Any periods of time Petitioner was asymptomatic were short in comparison to the more than 10 years Petitioner has already suffered. Therefore, the undersigned is not persuaded by Respondent's argument.

Regarding severity, the undersigned finds Petitioner had a moderately severe injury. This finding is based on the following facts. First, there was a delay in diagnosis and treatment for Petitioner's sJIA for over one-and-one-half years after onset of his symptoms. During this period, he suffered from fevers, night sweats, joint pain, body aches, rashes that were intermittently itchy, difficulty ambulating, sore throat, headache, and fatigue. He was treated with steroids, naproxen, a Kenalog injection, and other medications; he was hospitalized; he was seen by numerous specialists; and he underwent extensive testing, including blood draws, a bone marrow biopsy, and a punch biopsy. Once he was diagnosed with sJIA in July 2016, he received various treatments, including Medrol dose pack, Actemra (steroid agent), prednisone (corticosteroid), Dapsone (antibiotic and anti-inflammatory), biologics including Anakinra or Kineret (IL-1 inhibitor), Ilaris (IL-1 inhibitor), and methotrexate (disease-modifying antirheumatic drug). There were periods of time when insurance would not cover the medication and times he could not afford Ilaris and thus, he had a recurrence of significant symptoms. Further, there is no dispute that Petitioner continues to experience ongoing sequela, that his condition is chronic and will require lifelong treatment, and that he will continue to suffer for the remainder of his life.

23

Respondent offers comparable cases, and the undersigned finds Petitioner's case is similar to that of the petitioner in Ramsay. Both Petitioner here and the petitioner in Ramsay were 15 years old at the time of vaccination, were hospitalized (though Petitioner's hospitalization was shorter), and received steroids and methotrexate. Unlike the petitioner in Ramsay, Petitioner here went undiagnosed and untreated for one-and-one half years, received more treatment, and underwent more invasive testing (e.g., biopsies). Respondent speculated that the Ramsay petitioner had a worse injury because she "most likely" received the full amount for wage loss for a minor, "suggest[ing] [] there was evidence [her] sJIA would likely prevent her from any future gainful employment." Resp. Pain and Suffering Br. at 12-13. However, because damages were proffered, there was no discussion of the details about compensation. Without supportive evidence, which Respondent agrees the damages decision does not provide, these suggestions are speculative.

Like Ramsay, Cabrera does not provide any reasons in support of the pain and suffering award as it was also a proffered case.

Considering the record here, the undersigned finds that $250,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering and emotional distress for over 10 years. The award of $250,000.00 acknowledges Petitioner experienced the difficulties described and acknowledges the effects his illness has had on his life. This award also recognizes his emotional distress. Although Petitioner suffered intervening injuries (severe burn and motor vehicle accident), these injuries are not vaccine-related and are not considered in the undersigned's finding.

## IV.     OUT-OF-POCKET EXPENSES

As previously mentioned, the parties disputed the appropriate out-of-pocket expenses to be awarded to Petitioner, requiring adjudication from the Court. See Damages Tr. 101-02. The undersigned reiterates her previous determination that Petitioner is entitled to an award of $1,907.52 for out-of-pocket expenses. See Order dated Nov. 21, 2025, at 1-3 (ECF No. 261).

## V.      LOST EARNINGS

### A.      Legal Framework

Compensation awarded pursuant to the Vaccine Act shall include an award of anticipated lost earnings for vaccine-related injuries before attaining the age of 18. § 15(a)(3)(B). Petitioner bears the burden of proof with respect to this element of compensation. Brewer, 1996 WL 147722, at *22-23.

The statute establishes an objective formula based on national averages for use in calculating anticipated lost earnings here:

In the case of any person who has sustained a vaccine-related injury before attaining the age of 18 and whose earning capacity is or has been impaired by

24

reason of such person's vaccine-related injury for which compensation is to be awarded and whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond, compensation after attaining the age of 18 for loss of earnings is determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary.

§ 15(a)(3)(B).  Here, the parties do not dispute that Petitioner was a minor at the time he suffered his vaccine injury, and thus, any award for loss of future earning capacity is controlled by § 15(a)(3)(B).

Whether a petitioner's earning capacity is or has been impaired due to his vaccine injury and is reasonably anticipated to be impaired due to the severity of the vaccine injury is a threshold issue in awarding anticipated lost wages for children injured by a vaccine.  Holihan v. Sec'y of Health & Hum. Servs., No. 95-399V, 1999 WL 63954, at *2 (Fed. Cl. Spec. Mstr. Jan. 19, 1999), rev'd on other grounds, 45 Fed. Cl. 201 (1999) (addressing impaired earning capacity as the "initial factual issue" in a child's lost earnings claim); see also Brewer, 1996 WL 147722, at *24.  Factual determinations of earning capacity impairment "often turn on the opinion of an expert."  Holihan, 1999 WL 63954, at *2.

"If the court concludes that a minor is indeed suffering a vaccine-related injury, which impairs his . . . earning capacity, and the minor's earning capacity is likely to remain impaired at age 18 and beyond, the court awards an amount 'determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector.'"  Tembenis v. Sec'y of Health & Hum. Servs., 733 F.3d 1190, 1194 (Fed. Cir. 2013).  A petitioner is entitled to compensation for lost earnings under § 15(a)(3)(B) only when the petitioner is not capable of earning the average gross weekly earnings of workers in the private, non-farm sector.  Holihan, 45 Fed. Cl. at 205-07; see also Brown v. Sec'y of Health & Hum. Servs., No. 88-24V, 1989 WL 250117, at *7 (Fed. Cl. Spec. Mstr. Sept. 13, 1989), rev'd in part on other grounds, 920 F.2d 918 (Fed. Cir. 1990) (finding a petitioner ineligible for lost earning award under § 15(a)(3)(B) as the petitioner could not establish she was unable to earn less than the average gross weekly earnings of workers in the private non-farm).  In calculating lost earnings, a loss of Social Security retirement income has been classified as a form of "earnings" to be taken into account.  See Eilan ex rel. A.E. v. Sec'y of Health & Hum. Servs., No. 15-381V, 2024 WL 4222583, at *5-8 (Fed. Cl. Spec. Mstr. Aug. 15, 2024); Bryan, 2024 WL 3797739, at *14-16.

Case law addressing anticipated lost earnings in adults rejects compensation for anticipated loss of earnings that is based on speculation.  J.T. v. Sec'y of Health & Hum. Servs., No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (noting § 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation"), mot. for rev. den'd, 125 Fed. Cl. 164 (2016).  Furthermore, speculation around planned future endeavors should not be used in determining a petitioner's claim of future lost wages.  See J.T., 2015 WL 5954352, at *7, *10-12 (denying speculative future lost wages based on petitioner's claim that his vaccine injury prevented him from starting a new professional endeavor he planned to undertake); Moreland v. Sec'y of Health & Hum. Servs., No. 18-1319V, 2022 WL 10469047, at

25

*3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (noting a lost earnings award "may not be based on speculation"); Egbert v. Sec'y of Health & Hum. Servs., No. 21-593V, 2026 WL 459435, at *13 (Fed. Cl. Spec. Mstr. Jan. 16, 2026) ("The mere possibility that Petitioner's condition could improve or that she has some potential for retraining or increased earning capacity, however, is speculative."). For child claimants, determinations for lost wages should be based on the general work-life expectancy of an uninjured individual, not the petitioner's work-life expectancy. Brewer, 1996 WL 147722, at *25 (citing Edgar, 989 F.2d 473).

Failure to provide preponderant evidence to support a finding that a petitioner's earning capacity has been impaired because of a vaccine injury will result in denial of a lost wage claim. See, e.g., Dillenbeck v. Sec'y of Health & Hum. Servs., No. 17-428V, 2019 WL 4072069, at *12-13 (Fed. Cl. Spec. Mstr. July 29, 2019), mot. for review den'd, 147 Fed. Cl. 131 (2020).

### B.    Parties' Contentions[30]

### 1.    Petitioner's Contentions

Petitioner argues he is entitled to an award of anticipated lost earnings pursuant to § 15(a)(3)(B). Pet. Damages Br. at 1-14.

Petitioner's vocational expert, Mr. Tremp opined Petitioner suffered a 45% loss of earning capacity secondary to his vaccine injury. Pet. Ex. 78 at 13; Pet. Ex. 92 at 15. He based his opinions on his review of Petitioner's records and expert reports. Pet. Ex. 78 at 2-7; Pet. Ex. 92 at 2-8. To summarize, Petitioner reported continued arthritic pain ("a straining pain with every movement"), muscle aches, night sweats, chills, "lock jaw" type symptoms, with varying levels of intensity from day to day. Pet. Ex. 78 at 3; Pet. Ex. 92 at 3. Petitioner reported "[t]here are days when he can complete all activities of daily living with minimal pain and there are days where he is unable to complete any activities of daily living;" Petitioner explained "he has no choice but to function from day to day even when in pain." Pet. Ex. 78 at 3; Pet. Ex. 92 at 3. Petitioner described his physical limitations with reaching, lifting, grip strength, walking, climbing, driving, and overall physical stamina, and he reported difficulty with activities of daily living, including sleeping, showering, squatting on and off the toilet, completing housework, cooking, and doing laundry. Pet. Ex. 78 at 4-5. Additionally, Petitioner described prior employment and difficulties he experienced while completing his assigned duties as well as difficulty completing college level courses while working. Id. at 5-7; Pet. Ex. 92 at 12. Petitioner also reported feeling "sad, anxious, and depressed." Pet. Ex. 78 at 3.

Petitioner's economist, Dr. Mark S. McNulty, used 45% loss of earning capacity in determining the amount for lost earnings to be awarded to Petitioner from age 18 to age 66 (anticipated age of retirement), with appropriate adjustments made, including a 4.4% unemployment offset, reducing work-life expectancy to 46.9 years. Pet. Ex. 80 at 4-8. Dr. McNulty calculated $949,257.00 for loss of earnings. Id. at 8.

---

[30] In support of their positions, both parties filed expert reports from vocational experts and economists. For sake of brevity, only the most relevant and pertinent portions are included.

26

Dr. McNulty did not agree with Dr. Kennedy's Markov model as "there is no empirical evidence regarding the reliability of the Markov estimates." Pet. Ex. 84 at 5. He agreed "the data that is input into Markov algorithms is reliable," but argued "there is no evidence that the resulting Markov outputs are reliable measures of work behavior." Id.

Petitioner argues in his brief that using a 45% loss of earning capacity, he should be awarded 45% of the national average of the average gross weekly earnings of workers in the private, non-farm sector. Pet. Damages Br. at 3-4.

### 2.    Respondent's Contentions

Respondent acknowledges that the parties' experts disagree over loss of earnings, how long Petitioner will work, work-life expectancy or labor force participation, anticipated post-vaccine injury earnings and benefits, and whether lost retirement and health insurance benefits should be included in the award. Resp. Damages Br. at 11.

Respondent's vocational expert, Dr. Mortimer, opined Petitioner will have a reduced earning capacity of 10%-30% or 20% median for calculation purposes. Resp. Ex. I at 26. Dr. Mortimer considered Petitioner's "fatigue and polyarthritis with difficulty in ability to lift, walk, use of hands for keyboard and writing, and other mobility issues" as well as Petitioner's education and occupational wishes. Id. at 25. Dr. Mortimer agrees Petitioner's future employability should be sedentary or semi-sedentary, where he is mostly seated and not required to lift more than 10 pounds on a regular basis. Id. However, Dr. Mortimer opined Petitioner could work full-time because he is likely involved in 40 hours of activity weekly, which "demonstrate[s] his ability to participate in future employment at a full-time work schedule." Id.

In a supplemental report in July 2025, Dr. Mortimer changed her opinion and opined that based on additional records, which showed Petitioner was in a full school courseload, received certifications, and was working 28 hours per week, Petitioner would not have a reduced earning capacity "as long as [he] continues to be medically managed by Ilaris or other prescription." Resp. Ex. N at 3. Evidence presented at the damages hearing showed this was no longer the case.

Dr. Kennedy, Respondent's economist, provided opinions using a 20% reduced earning capacity and, at the undersigned's request, also a 45% reduced earning capacity. Resp. Exs. J-K. Though Respondent does not agree Petitioner has preponderantly established a 45% reduced earning capacity, Respondent's expert, Dr. Kennedy, used this percentage and concluded that Petitioner should be awarded $181,390.00 for total potential economic lost earnings once appropriate reductions were made. Resp. Damages Br. at 12, 20 (citing Resp. Ex. J at 9-10, 16; Resp. Ex. K). This amount takes into account an anticipated retirement age of 65.05 with a statistical work-life expectancy of 38.08 years using the Markov model. Id. at 16; Resp. Ex. K at 3. Additionally, this calculation assumes Petitioner will have a college degree because, according to Respondent, "the evidence in this case overwhelmingly supports [] [P]etitioner will complete his degree." Resp. Damages Br. at 15-16; see also Resp. Ex. J at 2-6; Resp. Ex. K at 4-5.

C.      Analysis

1.      Loss of Earnings

Whether a petitioner's earning capacity is or has been impaired due to his vaccine injury and is reasonably anticipated to be impaired due to the severity of the vaccine injury is a threshold issue in awarding anticipated lost wages for minors (under the age of 18 at the time of injury) injured by a vaccine.  Here, the undersigned finds Petitioner has suffered an impaired earning capacity and that his injury is of sufficient severity to reasonably anticipate that he has likely suffered an impaired earning capacity which began at age 18, and will be life-long.

This finding is based on medical and vocational expert opinions.  Regarding medical expert opinions, Dr. Gershwin opined that Petitioner has had severe and recurrent symptoms, that his sJIA is chronic, and he will require lifelong treatment.  Petitioner will require the continued use of Ilaris, he will have restrictions on lifting, and he will continue to have pain, fatigue, issues with sleep, an altered lifestyle, and the emotional toll of a chronic illness.  While Dr. Rose disagreed that Petitioner had a severe disability, he agreed that Petitioner had some degree of limitation.  Dr. Rose heard Petitioner's testimony explaining that he worked three days per week, taking alternate days off so that he could tolerate working.  Dr. Rose agreed this schedule was reasonable if it allowed Petitioner to work.

Contrary arguments from Respondent's experts assuming Petitioner will go into remission and/or be able to be weaned off medication (which has not occurred over the past ten years) are speculative.  See Moreland, 2022 WL 10469047, at *3 (noting a lost earnings award "may not be based on speculation"); Kreizenbeck v. Sec'y of Health & Hum. Servs., No. 08-209V, 2018 WL 3679843, at *31 (Fed. Cl. Spec. Mstr. June 22, 2018) (explaining special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support"), mot. for rev. den'd, decision aff'd, 141 Fed. Cl. 138 (2018), aff'd, 945 F.3d 1362 (Fed. Cir. 2020); see also Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2019 WL 2509626, at *19 (Fed. Cl. Spec. Mstr. May 24, 2019) (explaining special masters carefully scrutinize the reliability of each expert report submitted and do not rely on "opinion evidence that is connected to existing data only by the ipse dixit of the expert").

The undersigned's finding is also supported by vocational expert opinion.  Using the RAPEL standardized methodology for vocational rehabilitation professionals, and taking into account the opinions of Dr. Gershwin as to Petitioner's needs for life-long care of his disease, the effect of sJIA on earning capacity, and other relevant factors, Mr. Tremp opined that Petitioner suffered an average of 45% loss of earning capacity.

Dr. Mortimer agreed Petitioner has fatigue, difficulty lifting, walking, and using his hands for keyboard and writing, and other mobility issues, and that Petitioner's future employment should be in the range of sedentary to semi-sedentary.  Dr. Mortimer acknowledged that Petitioner's earnings will be adversely affected by his need for "treatment and medication management, reasonable accommodations, selective job placement, possible reduction and hours at times, and possible long term degenerative arthritis."  Resp. Ex. I at 26.  Dr. Mortimer opined

28

that Petitioner therefore had a reduced earning capacity between 10% and 30%, with a median of 20%.

Subsequently, Dr. Mortimer opined that Petitioner had no reduced earning capacity because his sJIA was well controlled on Ilaris. However, Dr. Mortimer did not consider Petitioner's testimony explaining that he had reduced his hours to three days per week due to his illness. Nor did she take into consideration Dr. Rose's testimony agreeing that a three-day work week was reasonable if it allowed Petitioner to continue to work.[31] Thus, the undersigned finds that Dr. Mortimer's opinions are not based on the current evidentiary record, and therefore, because the foundational underpinnings are inaccurate, her opinion is not reliable. See Dobrydnev v. Sec'y of Health & Hum. Servs., 566 Fed. App'x 976, 982 (Fed. Cir. 2014) (giving little weight to expert opinions that are based on erroneous factual assumptions); Walters ex rel. K.S.S.W. v. Sec'y of Health & Hum. Servs., No. 15-1380V, 2023 WL 3750716, *25 (Fed. Cl. Spec. Mstr. June 1, 2023) (finding expert opinions based on incorrect factual assumptions less persuasive and probative).

In summary, preponderant evidence supports a finding that Petitioner is unable to work full time and that Petitioner has suffered a 45% loss of earning capacity due to his vaccine-related injury of sJIA.

The second threshold question relates to whether that Petitioner will be successful in obtaining a bachelor's degree in the future. At the damages hearing, Petitioner's testified that he hoped to continue his education, although he acknowledged it was "definitely a challenge to work and do school." Damages Tr. 19-21. He added, "I need to work and I need to do school so I can get better work. So, it's like, I don't know, push through the pain, I guess." Damages Tr. 21.

Petitioner's vocational expert, Mr. Tremp, acknowledged Petitioner wants to obtain a bachelor's degree. In June 2025, Petitioner had changed schools and was attending online classes at Capella University, where he was studying cyber security, and he still hoped to obtain a bachelor's degree. He was enrolled in one class and did not know how long it would take to get a degree. Petitioner reported that "[h]e struggle[d] to keep up with his job and the coursework." Pet. Ex. 92 at 6.

Respondent's vocational expert, Dr. Mortimer, opined Petitioner will be successful in obtaining his bachelor's degree, and therefore, he could work full-time with earnings commensurate for males with a bachelor's degree. Dr. Mortimer estimated Petitioner's earning capacity with a bachelor's degree at $1,906.00 per week or $99,112.00 per year. Resp. Ex. I at 26.

The undersigned finds that the evidence shows that Petitioner hopes to obtain a bachelor's degree in the future. Case law provides, however, that hope, even reasoned hope, is insufficient evidence upon which to base an award. See, e.g., Moreland, 2022 WL 10469047, at

---

[31] The undersigned acknowledges Dr. Mortimer submitted her reports prior to Petitioner's testimony, and was thus not privy to this information.

*8 (denying lost commissions when evidence was no more than reasoned hope, which was rooted in speculation).  Although Petitioner indicated he wishes to do so during the damages hearing, it would be speculative to assume Petitioner will obtain his degree.  See id. at *3 (noting a lost earnings award "may not be based on speculation"); Egbert, 2026 WL 459435, at *13 ("The mere possibility that Petitioner's condition could improve or that she has some potential for retraining or increased earning capacity, however, is speculative.").  There is no dispute between the parties and experts that Petitioner wants to continue his college education.  However, Petitioner has difficulty working and attending classes.  Due to financial reasons, he chose to continue working and stopped attending classes.  It would be speculative for the undersigned to presume that Petitioner will at some date in the future complete his degree and obtain employment in that field given that Petitioner has spent a number of years trying to complete a degree, but has not yet been able to do so.  It would also be speculative to forecast a date in the future for his completion of a bachelor's degree, or to presume how long it will take him to get a job in his relevant field.

The Act provides that "compensation after attaining the age of 18 for loss of earnings [shall be] determined on the basis of the average gross weekly earnings of works in the private, non-farm sector."  § 15(a)(3)(B).  Thus, the undersigned will award compensation using a 45% loss of earnings and the basis for calculation such loss of earnings shall be the Vaccine Act statutory earnings provision.

## 2.    Retirement Age

Regarding retirement age, the undersigned rejects Petitioner's suggested retirement age of 66.  The undersigned finds the reasoning explained in Eilan informative here.  Eilan, 2024 WL 4222583, at *4.  Here, Dr. McNulty cites BLS data in support of an older retirement age.  The projection for the year 2032 shows that only 29.9% of those aged 65 to 74 are expected to remain in the workforce.  Further, the other papers cited by Dr. McNulty do not show that the current or projected average age of retirement for the majority of workers is 66.  Thus, it is more reasonable to apply a retirement age of 65.05, consistent with Respondent's expert's opinion.

## 3.    Work-Life Expectancy (Labor Force Participation)

The parties also dispute the methodology and reduction that should be used for work-life expectancy, a number that attempts to account for gaps or periods of separation from the workforce.  Case law provides that the goal of lost earnings in a Vaccine Act case is to replace the stream of income that the injured vaccinee would have enjoyed if he or she had not been injured.  Childers, 1999 WL 218893, at *18 (citing Edgar ex rel. Edgar v. Sec'y of Health & Hum. Servs., 989 F.2d 473, 477-78 (Fed. Cir. 1993).  In Childers, Special Master Hastings found that the work-life expectancy of an "average worker" was appropriate, disregarding the characteristics and disabilities of the injured vaccinee.  Id.

Here, Petitioner's expert, Dr. McNulty, used a reduction of "4.4% of gross wages for periods of unemployment" and although he noted that "unemployment is sporadic" it was "amortized over [Petitioner's] entire work life" based on forecasts from the CBO.  Pet. Ex. 80 at

30

5, 23.  This number (4.4%) represented the unemployment rate in 2025, as well as the average unemployment rate for 2027 to 2028.  Id. at 23.

Respondent's expert, Dr. Kennedy, opined that Petitioner's statistical work-life expectancy was 38.08 years based on a publication by Skoog et al. (referencing the Markov model).  See Resp. Ex. J. at 4., 17 fig. 4 (citing Resp. Ex. J-3).  Then, each year of Petitioner's earnings would be multiplied by the ratio between the statistical work-life expectancy to the number of years to retirement (0.81).  Dr. Kennedy stated he calculated the statistical work-life expectancy and projected final separation from the workforce by averaging data for males and females, consistent with Childers.  Resp. Ex. J at 4 n.20 (citing Childers, 1999 WL 218893, at *18).

In response, Dr. McNulty raised legitimate concerns about the Markov model, namely that it depends on current labor force status and it does not account for employment history.  Most concerning to the undersigned is that Shibata's research "cast[s] doubt on the long tradition of analyzing labor market dynamics assuming that observed labor force status follows the [] Markov model."  Pet. Ex. 99 at 44.  One data point is relevant here.  Across all education groups, workers aged 25 to 39 and 40 to 54 "have the longest expected number of years in employment in the next twenty years if they were employed for the past three years."  Id. at 61.  This point shows that application of the Markov model here, especially given the facts and circumstances of this case, may result in an underestimation of work-life expectancy as compared to other workers in the same age group as Petitioner, who have a work history of employment for the past three years.  Here, Petitioner has a history of working for the same company since 2023.

Special Master Horner provided a thorough explanation of the same arguments offered here by the same experts in another case involving a minor.  Eilan, 2024 WL 4222583, at *5.  He accepted Dr. Kennedy's opinion based on the Markov model, finding it was based on reliable and generally accepted methodology.  Id.  Special Master Horner noted Dr. McNulty's number based on the unemployment rates reported by the CBO was applied "as a proxy for reducing [the minor child's] work-life to account for periods [the minor child] may out of the workforce."  Id. at *4.  However, in Eilan, the minor child did not have a work history and there was no evidence to suggest that the Markov model would result in an underestimation of work-life expectancy.  Id. at *5.

For these reasons, the undersigned finds that the Markov model as applied here does not account for Petitioner's brief but informative work history.  While the undersigned shares the concerns expressed by Special Master Horner in Eilan regarding Dr. McNulty's approach, the Markov model is not an appropriate fit here.  Thus, the undersigned adopts Dr. McNulty's reduction of 4.4% as the more reasonable and appropriate approach given the facts and circumstances of this case.  Petitioner's statutory earnings shall be calculated to reflect a 4.4% reduction consistent with Dr. McNulty's opinion.

31

### 4.    Calculations

The parties are directed to calculate Petitioner's past and future lost earnings using the undersigned's above findings, including a 45% loss of earning capacity, retirement age of 65.05, and a work-life expectancy using Dr. McNulty's factor of 4.4%.  The award shall include any loss associated with Social Security retirement benefits consistent with Bryan.[32]  See Bryan, 2024 WL 3797739, at *14-16.

Furthermore, the parties shall apply the statutory earnings set forth in the Vaccine Act applicable for those who were minors at the time of their vaccine injury: "[C]ompensation after attaining the age of 18 for loss of earnings is determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy."  § 15(a)(3)(B).  As the Judge in Holihan explained,

> The statutory language does not mandate that qualified vaccinees, *ipso facto*, receive or be paid the total earnings of the average non-farm worker; instead, the language provides that compensation is to be determined or calculated on the basis of average non-farm wage earnings.  Thus, the wage of a prototypical non-farm worker does not constitute the award amount, but rather serves to provide a basis for calculating the amount to be awarded. . . .
>
> . . .
>
> . . . The House Committee Report that adopted the final and current language of the statute also provided a [section] that set forth how the program was to function[,] [which] states that "[i]f the earning capacity of the injured person is determined to be impaired, the award is to be adjusted to include *lost earnings up to* the level of the average weekly earnings of workers in the private, non-farm sector, with appropriate offsets.

Holihan, 45 Fed. Cl. at 205-06 (internal citations omitted).

## VI.    DISPUTED LIFE CARE PLAN ITEMS

### A.    Legal Framework

As previously mentioned, Petitioner "bear[s] the burden of proof with respect to each element of compensation requested."  Brewer, 1996 WL 147722, at *22; see also § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records

---

[32] Dr. McNulty stated that his calculation of retirement benefits included "employer contributions to a private retirement plan and Social Security benefits."  Pet. Ex. 80 at 6.  He did not define or discuss the "private retirement plan."  For clarity, the undersigned notes she does not award any compensation based on employer contributions to "a private retirement plan" as there has been no evidence or case law submitted to substantiate that such is a compensable item of damages here.

32

and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . .").

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

    (i)     result from the vaccine-related injury for which the [P]etitioner seeks compensation,

    (ii)    have been or will be incurred by or on behalf of the person who suffered such injury, and

    (iii)   (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs., No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); see also I.D., 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting Scheinfield v. Sec'y of Health & Human Servs., No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); Bedell v. Sec'y of Health & Hum. Servs., No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); Alonzo v. Sec'y of Health & Hum. Servs., No. 18-1157V, 2023 WL 5846682, at *11 (Fed. Cl. Spec. Mstr. Aug. 14, 2023).

### B.    Contentions and Analysis

#### 1.    Medicare Part B

Petitioner requests the premium and deductible for Medicare Part B from 2064 (Age 65) to life expectancy. Resp. Post-Hearing Status Rept., App. A at 3. Respondent agrees to only the deductible, arguing the premium for Medicare Part B "is a routine expense for individual age 65 and older." Id. Petitioner provided no additional evidence to show the premium is not a "routine expense."

The undersigned agrees with Respondent and will award only the deductible, which is $257.00 per year from 2064 to life expectancy. This is also in accordance with the case law.

33

See, e.g., Young v. Sec'y of Health & Hum. Servs., No. 20-0496V, 2025 WL 3153999, at *11 (Fed. Cl. Spec. Mstr. Oct. 6, 2025) (awarding petitioner her Medicare Part B annual deductible, but not premiums for her Medicare Part B).

### 2.    Emotional Support Animal Expenses

Petitioner contends an emotional support dog[33] is compensable under "medical or other remedial care determined to be reasonably necessary" and for "emotional or behavioral therapy." Pet. Damages Br. at 14 (quoting § 15(a)(1)(A)(iii)(I)-(II)).  For support, Petitioner cites to statements from Dr. Gershwin indicating concern for Petitioner's emotional, psychological, and mental well-being.  Id. (citing Pet. Ex. 61 at 1; Pet. Ex. 94 at 4).  During the damages hearing, Petitioner noted he has not discussed a need for an emotional support animal with a mental health care provider or his health care providers as they focus on his blood work and symptom management, not his mental health or daily life.  Damages Tr. 35.

Respondent maintains costs relating to the care of an emotional support animal are not compensable.  Resp. Damages Br. at 4-9.  Respondent argues an emotional support animal does not fit into any enumerated item of compensation under the Vaccine Act.  Id. at 4-5.  Respondent distinguishes service animals from emotional support animals, and argues Petitioner "has not offered any evidence that he cannot designate one of his current pets as an [emotional support animal], why he requires an [emotional support animal] designation, or any process necessary to designate a pet as an [emotional support animal]."  Id. at 5-6.  Furthermore, Respondent contends "[P]etitioner has not established that costs associated with designating a pet as an [emotional support animal] and providing it with routine care is appropriate for compensation under the Act, as it is logically too attenuated from [P]etitioner's diagnosis of [sJIA]."  Id. at 6.  Respondent also notes that none of Petitioner's treating physicians recommended an emotional support animal as treatment for his sJIA.  Id. at 7.  Lastly, Respondent contends that Petitioner's request here is a "routine expense" associated with owning a pet.  Id. at 8-9.

After a review of the parties' briefs, case law, and the Vaccine Act, the undersigned agrees this cost exceeds the scope of what was contemplated by the Vaccine Act.  The Vaccine Act does not contemplate an emotional support animal, and it exceeds case law interpretations of the terms "medical or remedial care" or "emotional or behavioral therapy."  None of Petitioner's treating physicians provided an opinion that an emotional support animal would be reasonably necessary for Petitioner's sJIA.  For support, Petitioner cited to statements from Dr. Gershwin in which he notes his concerns with the "emotional toll" of sJIA on Petitioner and well as the need for "psychological and emotional support."  Pet. Damages Br. at 14 (quoting Pet. Ex. 61 at 1; Pet. Ex. 94 at 4).  However, Dr. Gershwin does not provide an opinion on an emotional support animal or otherwise provide evidence that an emotional support animal is necessary for emotional support and treatment of Petitioner's vaccine-related injury of sJIA.  Thus, the undersigned finds Petitioner has not provided sufficient evidence to support this cost and it will not be awarded.

---

[33] Petitioner is seeking expenses associated with the care of an emotional support animal, not the cost of acquiring an emotional support animal or service animal.

### 3. Housekeeping Services

Petitioner requests $2,564.16 per year for 24 housekeeping services per year. Resp. Post-Hearing Status Rept., App. A at 13.

Respondent maintains this cost is "[t]oo speculative and considered a routine expense." Resp. Post-Hearing Status Rept., App. A at 13. At the damages hearing, Respondent's expert, Dr. Rose noted there was nothing in the medical records to support a need for housekeeping services. Damages Tr. 77.

During the damages hearing, Petitioner explained he is not able to do a "deep clean." Damages Tr. 94. Petitioner can clean his area of the home, though "[s]lowly over a period of time." Id. He also noted he has assistance from his mother with cleaning. Id. Petitioner acknowledged that he has not discussed housekeeping needs with his providers. Damages Tr. 35.

Given Petitioner's testimony at the damages hearing, the undersigned preliminarily found that "having house cleaning services for his portion of the home once a month would be . . . a reasonable expense." Damages Tr. 99. The undersigned maintains this preliminary finding.

Petitioner's post-hearing brief contends that the undersigned provided an award for only half of what was requested because "[Petitioner] ha[s] a roommate and therefore he was only responsible for cleaning half the time." Pet. Damages Br. at 15. This is not accurate. The undersigned's preliminary finding awarded housekeeping services once per month, or 12 times per year. Because Petitioner requested 24 housekeeping services per year, he will be awarded only half of this request, which is $1,282.08 per year.

Overall, in accordance with the undersigned's preliminary finding, Petitioner is awarded housekeeping services in the amount of $1,282.08 per year from now to life expectancy, which accounts for a total of 12 services per year, or one per month.

## VII. CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, and applied the Vaccine Act, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded (1) $250,000.00 for pain and suffering and (2) $1,907.52 for out-of-pocket expenses, (3) lost earnings in accordance with the undersigned's findings, and (4) an amount sufficient to fund the life care plan items agreed upon by the parties as well as those awarded herein.

The parties are to file a joint status report within 30 days, **by Friday, June 5, 2026**, (1) providing a complete and final life care plan which takes into consideration the items adjudicated herein, (2) providing a joint status report confirming the amount of all items of damages, and (3) confirming that all items of damages have now been resolved and that no issues remain outstanding.[34]

Thereafter, a damages decision will issue.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

---

[34] If the parties are unable to agree on the amount of the net present value to be used for calculating the future award, the parties shall request that the undersigned resolve the issue in her damage decision.